Filed 1/11/23  In re N.W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re N.W., et. al.,  Persons Coming Under the Juvenile Court Law. | |
| | D080280 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. EJ4734A-C) |
| Plaintiff and Respondent, | |
| v. | |
| M.W.et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed in part and reversed in part.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant Mother, M.W.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Father, P.W.

Claudia Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

M.W. (Mother) and presumed father, P.W. (Father), appeal from the juvenile court dispositional orders requiring continued out-of-home placement of their three daughters. The parents contend substantial evidence does not support the removal orders because there were reasonable means available to keep the children in the home. Additionally, the parents challenge the requirements that they complete a 52-week child physical abuse parenting class and visit with the children only when supervised. Mother also asserts that the juvenile court abused its discretion in requiring her to submit to drug testing.

We conclude the court abused its discretion in ordering both parents to complete the physical abuse parenting class, but otherwise affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Health and Human Services Agency (Agency) in 2015, and had been the subject of 11 referrals prior to the ones resulting in detention.[1]

A. *Circumstances Leading to Removal of the Children*

On January 18, 2022, police conducted a welfare check and found that all three children—N.W. (age eight), B.W. (age seven), and M.W. (age two)—were infested with lice. The girls reported having lice in their hair, ears, mouths, and bellybuttons. Having conducted a welfare check two months earlier, the officer noted that the children's lice had gotten worse, and the

---

[1] "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

girls now had scabs and bug bites around their hairlines and ears. The officer also reported concerns that B.W. had been seen wandering the complex unattended on previous occasions.

Upon entering the home, the officer noted that its condition had also deteriorated since the last welfare check. It was dirty and cluttered, and the officer observed cockroaches in the kitchen, living room, and bathroom. Police removed the children from the home, arrested both parents for child neglect, and contacted social workers.

When the social workers arrived at the home, all three children had matted hair infested with lice and lice crawling all over their bodies and clothing. Their faces, nails, and clothes were dirty; they had flaky, dry patches on their scalps; and they smelled strongly of a "foul odor." As a social worker interviewed them, the children scratched their heads, legs, arms, and necks. The social worker observed several red marks on their bodies. She also saw lice crawling on Mother's hair and observed that Mother wore dirty, tattered clothing and emitted a body odor.

A strong foul smell also emanated from the home, and the couch where the children slept was covered with lice. Blankets on the couch appeared brown and unwashed. There was only a narrow space to walk through the dirt and clutter on the floor, and the surfaces could not be seen because they were piled with trash, rotting food, and dirty dishes. The refrigerator smelled of rotting food and had dark brown spots inside. There were multiple bottles of alcohol on the counter and in the refrigerator. The room where Father indicated the parents slept was piled with mattresses, boxes, and clothing.

Social workers attempted to craft a safety plan with the parents to avoid having to remove the children, but the parents denied having any local support system. As a result, the children were taken to Polinsky Children's

Center (Polinsky) where it was determined they had not eaten all day (although Mother had allowed them to eat chips and water during the home investigation). The next day, B.W. and M.W. were admitted to the Intensive Care Unit at Rady Children's Hospital (Rady) with anemia and low hemoglobin levels. They were given immediate blood transfusions. A Rady doctor explained that their low blood and hemoglobin levels were "mostly due to sever[e] lice, sucking the blood out for years." She noted that B.W.'s pediatric records indicated a chronic lice infestation starting at age three and classified the incident as a near fatality.[2]

A social worker interviewed Mother after the children were removed. When asked about the liquor bottles in the home, Mother said they were "[o]ld" and indicated she had not consumed liquor in four to six months (and even then, she said she had only one to two drinks at a time). Mother stated that she did not use drugs, other than occasionally smoking marijuana in the past, but did smoke cigarettes. She disclosed current diagnoses for depression, anxiety, panic disorder, and posttraumatic stress disorder (PTSD). Mother indicated she last sought medical treatment for these mental health conditions three years ago.

The social worker then inquired about the children. Mother said she had been treating their hair every six months. She explained that unless Father took time off work to provide transportation, it was difficult for her to take the girls to the dentist because they had to take multiple buses.

At the conclusion of the interview, a social worker provided Mother with information regarding lice treatment, free dental appointments, and

---

[2] The doctor also noted that B.W. had an elevated lead level at age four, but it did "not appear there was follow up on this even though reminder notes were sent to mother." B.W.'s chart revealed that her lead levels remained elevated in November 2019, and the county was notified.

counseling in their area. The social worker also offered to provide supplies for cleaning and treating lice, but Mother stated she would reach out to the homeless liaison at the children's school. A social worker expressed concern about the family's home, but somewhat inexplicably indicated it did "not reach [Child Welfare Services] concerns for safety."

During Father's interview that day, he explained that they cleared up the lice over the summer, but the children were infected again once they returned to school. He acknowledged that B.W. had gotten out of the trailer unsupervised two different times. He claimed to have ordered door alarms after the first incident, but did not state whether he installed them. According to Father, B.W. sees a doctor every month for ADHD[3] medicine. He indicated that the home smelled because their two dogs use the bathroom.

When asked about substance abuse, Father said he "hardly ever" drinks alcohol and that his last drink was at least a month ago. He said he uses marijuana for his mental health issues. He denied any other drug use and stated he did not attend therapy.

A social worker also contacted the paternal grandmother, who had moved from San Diego to Texas a few months earlier. She was aware of the cleanliness issues, but confirmed that the parents had treated the lice multiple times and said the father cleaned the trailer biweekly. She did not have concerns about either parent abusing alcohol.

The day after removing the children, the Agency contacted the parents. Mother reported that she expected to be done cleaning the trailer and treating her own hair for lice the next day. When asked if she gave the children medicine at night, she stated that she used to give them chocolates

---

3     ADHD stands for attention deficit hyperactivity disorder. (Stedman's Med. Dict. (28th ed. 2006) p.29, col.1.)

containing melatonin, but when those stopped working she gave them Nyquil. Later, she acknowledged having given them Nyquil every night for the last three to four months. Mother agreed to drug test, but Father was upset about the request. Paternal grandmother, who was also on the phone, told him, "[d]o what you have to do to get the children back, go get tested."

B.      *Prior Contact with the Agency*

In early 2015, the family was homeless, and the Agency received reports of the parents fighting and throwing things in their car. Additional reports of frequent yelling were lodged twice in 2017, along with allegations that the parents slapped one child on the rear and another child in an unspecified location (though no marks or bruises were observed). In October 2017, Mother called the police because Father threw a television off a cabinet while having what he described as "one of my mental health issues." Because Father scratched his arm in the process, Mother was determined to be the primary aggressor and was arrested. A family sharing their home in 2018 called to report frequent verbal and physical fighting between the parents. The Agency received another report of screaming in 2019.

The neglect allegations began in 2017 when neighbors reported the children frequently being left outside unsupervised near a busy intersection. When the agency responded to the fighting call in 2018, there were "concerns for the cleanliness of the home due to the children having lice for an extended period of time." Further reports of neglect in July and August of 2019 indicated that the children had suffered from lice for over a year and the house was infested with roaches. The Agency expressed concern that Mother did not know how to properly treat the lice after learning that she would wash the sheets and then allow N.W. to sleep in them with lice in her hair. The next morning, Mother would treat N.W.'s hair, but then let her sleep in

6

the lice-infested bed. During the investigation, the parents accepted assistance from the school district, which sent a "lice expert" to treat the home and family. The Agency also purchased new beds and dressers for the family to prevent further lice infestation in the home. But the parents' follow-through afterwards was described as "questionable."

Accounts in January and September of 2020 again involved roaches and lice. The children reportedly had bald patches in the front of their heads and said that their mother was not treating the lice. Although the school offered to pay for treatments, Mother would not accept help.

In response to a neglect call in November of 2021, the Agency discovered that the girls had missed school because of lice, despite school staff members dropping off lice treatments. Police did not intervene at this time because the family had adequate food and water and the children looked clean.

An ongoing investigation opened in December 2021 noted that B.W. and N.W. missed 60 days of school due to lice. Both girls had rotten and missing teeth. During an interview, Mother acknowledged having mental health issues, but said she "does nothing" about her symptoms. Father stated he was diagnosed with ADHD, intermittent explosive disorder, depression, and bipolar disorder as a child, and was found to be impulsive/compulsive. Although he denied currently taking any prescription medication, he admitted using marijuana and drinking one to two beers a day. Father said Mother occasionally used marijuana too but had not done so in over six months. He explained that he had been working 60-70 hours a week but planned to schedule some time off during the week so he could help with doctor's appointments, dental visits, and cleaning. He accepted the social worker's offer of lice treatments and cleaning products.

B.W. was found unattended at the trailer park twice in January 2022. The officer who took her home the second time noted that all three children scratched themselves continuously and complained of skin pain. Police removed the children the next day.

C.    *Preliminary Dependency Proceedings*

Based on its ongoing investigation, the Agency filed juvenile dependency petitions for all three girls on January 20, 2022, alleging one count under California Welfare & Institutions Code[4] section 300, subd. (b). During the subsequent detention hearing, the court found that a prima facie showing had been made that the children were individuals described by section 300. It ordered out-of-home placement, voluntary reunification services, and supervised visitation.

The Agency's subsequent case plan recommended that both parents undergo psychological evaluation, complete a parenting education class, and participate in a 52-week long child physical abuse parenting group. The case plan further called for Father to submit to on-demand drug testing.

On February 15, 2022, the juvenile court held a jurisdictional hearing, sustained the petitions, and made a true finding as to the allegations contained in the petitions.

D.    *Agency Investigation Following Removal*

Following removal, the children were medically evaluated. Eight-year-old N.W. was diagnosed with anemia. She had a severe lice infestation and a rash on both hands. Seven-year-old B.W.'s severe anemia required a blood transfusion as well as blood pressure support. She appeared to have extremely poor hygiene and needed extensive dental work. Finally, two-year-

---

4    Statutory references are to the Welfare and Institutions Code unless noted.

8

old M.W. also received a blood transfusion for severe anemia. She too was observed to have extremely poor hygiene and dental issues, and was referred to be evaluated for possible autism.

Over the next few weeks, teachers and therapists assessed the children. A therapist diagnosed the oldest child, N.W., with acute stress reaction disorder and noted that she soiled her pants constantly and had vivid nightmares of her parents arguing. She could not write her name and was referred for a learning disability evaluation. B.W. was diagnosed with an adjustment disorder with depressed mood. She was unable to sleep at night because she cried and missed her parents. A teacher indicated that B.W. followed all school rules and seemed ok, while the therapist described her as "very intellectual." M.W. had been receiving services through an early start program and was due for an evaluation near her third birthday.

During a forensic interview, N.W. said she missed her parents "very much" and that they tried all types of lice treatments. She said her parents "fight with words" a lot and it makes her feel scared. She reported that she takes two pills that help her sleep and that her "mom and dad take pills" too, but she did not know what their pills were for. N.W. was anxious to finish in time for her parents' visit.

A social worker interviewed B.W., who reported that the last time she showered at her home was "[a] long time ago." When asked about having lice she said, "Mommy said she was going to treat it with treatment[,] but she never did it." She confirmed that her mother gave her "Nyquil because it helps us calm down and go to sleep." But B.W. reported that she loved her family and that her mother helped her do her laundry and her "daddy help[ed] cheer her up by talking to [her]."

9

During a call with the parents, Father indicated to a social worker that the children should be placed with the paternal grandmother if they could not return home, and that the parents would move to Texas if the children were placed with her. A few days later, the parents met with a social worker in person and explained that they had washed all the bedding and stuffed animals, sprayed the furniture with lice repellant, and planned to fog the home that day. Both parents had shaved their heads.

When asked to describe a typical daily routine, Mother stated that the girls would stay up all night and go to bed around 5:00 or 6:00 a.m. She would wake them around 11:00 a.m. for lunch and then they would play, mostly on electronics, until they started their bedtime and shower routine at 7:00 p.m. Mother opined that the home deteriorated because she got no sleep, Father was always at work, and she was a little overwhelmed because all the work fell on her.

Mother provided background information about her own childhood, explaining that she and her brother were removed from her parents at age six and placed in foster care. They were adopted together when she was 10, but she stated that she was physically abused by her foster parents and sexually abused by her brother.

When asked about the children's most recent doctor visits, Mother mentioned that a pediatrician recommended follow-up blood work for B.W. at a well-check visit in June of 2021. There is no indication Mother ever took her to have the blood drawn.

Father acknowledged having had lice problems in their prior home. He agreed that he worked long hours as a general manager at a fast-food restaurant, which left Mother primarily responsible for the childcare and housecleaning. He said he stopped taking any prescription medication when

10

Mother was pregnant with N.W., and copes with his mental health issues by listening to music and smoking marijuana. He stated that he tried crystal methamphetamine once when he was eighteen, he drinks alcohol one to two times per week, and occasionally has a shot of "Everclear."

The Agency continued to work with the family in February 2022. All three girls had dental appointments to have cavities filled. The Agency's addendum report indicated that paternal grandmother initially could not take the girls because she was caring for an ill husband, but that he had passed away and she wished to be considered for placement. Father was informed that TERM would not assign him to classes until a psychological evaluation was done and they ensured his mood disorders were stabilized.

By March, Mother had completed her parenting classes and Father was nearly done. The parents visited the children several times at Polinsky; they were observed to have positive interactions with the children and to have taken on a "parental role." Neither parent had undergone a psychological evaluation or started the child physical abuse classes.

On March 7, 2022, the Agency asked Father to randomly drug test and he tested positive for amphetamines and methamphetamines. He denied use and suggested that perhaps energy drinks, or a natural energy drink not sold in stores that his friend gave him, caused the positive result. The Agency then asked Mother to drug test. There is no indication in the record that she has done so.

E.    *The Disposition Hearing*

The juvenile court held a contested dispositional hearing on April 5, 2022. It found that the Indian Child Welfare Act did not apply and admitted the Agency's reports into evidence. The parents each submitted photos of the family home, and Mother made an offer of proof that the parents received a

11

pullout couch, so the home now had a bed for the parents and a bed for the children.

The court found by clear and convincing evidence that "[t]here is a substantial danger to the physical health, safety[,] protection[,] or physical or emotional well[-]being of these children or would be if they were returned home. . . ." and "[t]here are no reasonable means by which the physical health can be protected without removing them from the parents' physical custody." It authorized foster care pending possible placement with the maternal grandmother and ordered the parents to comply with the case plan. The court noted: "I am in agreement with the plan because I think it was said, what's going on here? I have to agree, I mean, 35 years I've been involved in dependency, and I've never have seen kids hospitalized for blood transfusions due to lice infestation. And that's just kind of, you know, how does that happen?"

On the same day, N.W. and B.W. were removed from Polinsky and placed in a foster home. The Agency placed M.W. with a different foster family. The effort to coordinate with child welfare services in Texas so that the children could be placed with paternal grandmother remained ongoing.

DISCUSSION

A. *The Removal Order*

Mother challenges the sufficiency of the evidence supporting the dispositional orders removing the children. She argues that because the sanitation issues in the home had been addressed by the time of disposition, the Agency should have returned the children and offered services to assist the family in maintaining the cleanliness of the home and children. Mother further contends that substantial evidence did not support the court's finding

12

that the Agency made reasonable efforts to prevent removal. Father joins in Mother's arguments.[5]

    1. *The standard of review*

"The fundamental right to the care and custody of one's child is protected by constitution and statute." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525 (*Henry V.*); accord *In re Jasmon O.* (1994) 8 Cal.4th 398, 419–420.) "A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature." (*Henry V.*, at p. 525.)

Section 361 is the governing statute, and it imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. (§ 361, subd. (c).) The statute provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a *substantial danger* to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, *and* there are *no reasonable means* by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (*Ibid.*, italics added.)

---

5    Although language in Father's brief could be read to challenge jurisdiction, he makes no specific arguments to this effect and his entire focus is on disposition. To the extent he intended to challenge jurisdiction, we deem it abandoned due to his failure to present meaningful legal analysis. (*See Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119–20 [An appellate court is not required to "consider alleged error where the appellant merely complains of it without pertinent argument"].)

This heightened burden of proof for removal reflects a legislative effort to keep children in their homes with their parents when it is safe to do so. (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.) "By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, *not* removal.' " (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115; see also *In re Kieshia E.* (1993) 6 Cal.4th 68, 76 ["[b]ecause we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures"].)

We review a dispositional order removing a child from a parent for substantial evidence, "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 (*O.B.*).) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995–96.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

14

2. *Substantial evidence supports the juvenile court's finding that reasonable means did not exist to support the family in the home and that the Agency made reasonable efforts to prevent removal*

a. *Reasonable means*

The parents contend the juvenile court's orders were not supported by substantial evidence. They acknowledge that the home was filthy and infested with insects (lice and cockroaches), and that the children were harmed as a result. But they argue that because they cleaned the trailer, shaved their heads, and cooperated with Agency efforts prior to the disposition hearing, no substantial risk to the children's safety remained should they be returned with strict Agency supervision and assistance. Accordingly, they submit that reasonable means existed to safely maintain the children in the home.

This contention takes too narrow a view of the evidence. In fact, police only removed the children after *four years* of regular and prolonged lice infestations and frequent Agency interventions. The Agency, the school, and doctors repeatedly worked with the parents to treat the lice, yet the parents subsequently displayed a total lack of understanding as to how they could prevent lice infestations in the future. Mother contends that if the Agency provides sanitation services, a "lice expert," regular lice checks, and oversight of medical treatment, the home will not devolve into a "substantial danger" overnight. But even before the lice infestation progressed to life-threatening anemia, the parents' neglect in treating the lice caused the children physical harm in the form of pain, scabs all over their heads, constant itching, and bald patches. Given that the parents have repeatedly failed to maintain a lice-free home, and apparently already re-infected their children while at Polinsky, the court could reasonably infer that these harms would promptly

15

recur, and that Mother might again respond inappropriately, by drugging the children or screaming at them.

Moreover, the "reasonable means" proposed by the parents do not address their other neglectful behavior. Pediatricians twice recommended follow-up blood work for B.W. that the parents did not pursue: first for elevated lead when she was three (which apparently was not rechecked until she was five) and again in June 2021. The latter test likely would have revealed the anemia before it endangered B.W.'s life. The parents also did not take the girls to the dentist despite rotting and missing teeth.[6] Although B.W. wandered off unsupervised in dangerous locations within the trailer park twice in the two weeks prior to removal, there is no indication Father installed the promised door alarms. Further, it does not appear Mother made any effort to address the eight-year-old's persistent soiling issues or to dress the children appropriately for cold weather. It is the trial court's province to weigh evidence, and the evidence supported an inference that the circumstances presented a substantial ongoing danger to the children's physical health and safety. A reviewing court may not reweigh the evidence, indulge in inferences contrary to the trial court's findings, or substitute its judgment for that of the trial court. (*In re G.C.* (2020) 48 Cal.App.5th 257, 269 (*G.C.*).) Considered together with the harm caused to the older girls' emotional well-being by witnessing verbal altercations between their parents

---

[6] Although the parents contend the Agency could provide oversight of medical treatment, there is no evidence in the record to suggest the Agency is able to offer the level of service the family requests. To avoid the medical and dental neglect that occurred, the Agency would need to monitor each doctor's order and scheduling recommendation and then ensure the family appeared for the recommended appointment or test. The fact that the Agency thus far has recommended free dental services closer to the family's home suggests that this degree of monitoring is not a reasonable option.

and missing months of school, we find substantial evidence supporting the conclusion that reasonable means did not exist for maintaining the girls in their parents' custody.

Furthermore, the evidence supported an inference that untreated mental health or substance abuse issues contributed to the neglect[7], and yet the parents had done nothing by the time of the dispositional hearing to treat these issues. The Agency referred the parents for psychological evaluations, but both declined to participate. A trial court is entitled to consider the parents' unwillingness to comply with Agency attempts to provide assessments and services geared towards making reunification possible. (*See In re E.E.* (2020) 49 Cal.App.5th 195, 217 (*E.E.*).) The Agency also referred the parents for drug tests, but there is no evidence in the record that Mother has ever complied. While Father did submit to a drug test, he tested positive for methamphetamine, then denied using the drug, offered implausible excuses for the positive result, failed to disclose his positive test result to the substance abuse specialist, and refused to test again. "The inference from his denial is that he is less likely to change his behavior in the future." (*V.L.* (2020) 54 Cal.App.5th 147, 156.) Thus, the juvenile court could conclude that the neglect issues would recur because both parents failed to treat their admitted psychological disorders or acknowledge evidence of substance abuse issues.

If neither parent will acknowledge that their mental health issues are affecting their children, or take steps to assess and treat them, the juvenile

---

[7] Although Mother notes that the Agency's concerns about mental health and substance abuse were not pled in the petition, the petition need not recite the entire contents of the social worker's report. (*In re T.V.* (2013) 217 Cal.App.4th 126, 131.) "The statute 'merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction.'" (*Ibid.*)

court could find that no reasonable means existed to avoid continued substantial danger to the children if they were returned home. (*See In re John M.* (2012) 212 Cal.App.4th 1117, 1124–1125 ["in evaluating current risk, court should consider evidence of parent's current understanding of and attitude toward the past conduct that endangered a child" and evidence that the behavior is unlikely to change].) "[W]e cannot second guess an order supported by substantial evidence" simply because a parent has engaged in some, but not all, of the offered reunification services. (*V.L., supra*, 54 Cal.App.5th at p. 158.)

Mother asks us to apply the dissent's reasoning from what she characterizes as the factually similar case of *G.C., supra,* 48 Cal.App.5th 257. The children in that case were removed for neglect when protective services discovered them in a filthy home that smelled like marijuana, with feces and urine on the floor, expired food in the refrigerator, and moldy food in the cabinets. (*Id.* at p. 259.) Because the father was deployed with the military and the family had no local support, the agency removed the children. (*Ibid.*)

By the time of the jurisdictional hearing, the mother was back on her medications and felt better, the father was home, and the paternal grandmother had come from New York to clean the house and help with the children. (*G.C., supra,* 48 Cal.App.5th at pp. 261, 266, 273.) But the trial court upheld out-of-home placement and ordered reunification services explaining, " 'simply cleaning up the home and getting involved in services doesn't alleviate the fact that this is the third time a social services agency has been involved with the family and the issues are still unresolved.' " (*Id.* at p. 264.) The reviewing court affirmed the juvenile court's orders. (*Id.* at p. 266.) But the dissent suggested that removal was inappropriate because "[e]very single safety risk identified at the time of the referral was gone" and

18

"there was no showing of a substantial danger to the children in the parents' home." (*Id.* at p. 273 (dis. opn. of Menetrez, J.).)

Even the reasoning of the dissenting justice in *G.C.* does not require a reversal here. Unlike in *G.C.*, many of the safety risks identified at the time of removal are *not* gone. Mother is not taking prescription medication for her admitted mental illness and has failed to attend scheduled appointments for a psychological assessment. Whereas the father in *G.C.* was deemed a suitable caregiver, Father is part of the problem and only increased Agency concerns by testing positive for methamphetamines after removal. This family has a paternal grandmother who has helped in the past, but she is not able to come to California and help for " ' "as long as she [is] needed for support" ' " as in *G.C.* (*G.C., supra,* 48 Cal.App.5th at p. 266.) There is no other outside support.

Finally, Father attributed the strong smell in the home to "the two dogs using the bathroom," but there is no indication in the record that the parents got rid of the dogs. As such, the dissenting justice's reasoning does not compel a conclusion that insufficient evidence supported the trial court's decision in this case. This is not just a "filthy home" case like the ones Mother cites where simply cleaning the home will mitigate the risk of future harm.

Mother's final argument is that the children's placement in foster care caused distinct harm that could and should have been avoided. The Agency contends that because this assertion and the secondary sources on which Mother relies were not presented to the juvenile court, Mother has forfeited the argument.

We do not find that forfeiture can be invoked. A party forfeits the right to challenge a ruling on appeal if it could have objected in the trial court *but*

*did not.* (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) In discussing placement with the Agency, Mother stated "I went through foster care and I know how screwed up the system is." She then expressed her desire to have the three girls raised by their paternal grandmother. This information was included in the jurisdiction/disposition report admitted into evidence at the contested disposition hearing. The Agency plays a hybrid role in that it is required to exercise executive functions, like investigating child abuse and neglect cases, as well as judicial functions, including providing essential information to the court in the form of social studies and other reports. (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 6-8.) Because the court must review the Agency's reports (Cal. Rules of Court, rule 5.690(b)), we conclude Mother sufficiently raised the issue before the trial court. Furthermore, the Agency cites no authority for the proposition that appellants must have presented specific secondary sources to the trial court in order to have them considered on appeal. To the contrary, the law requires only that the litigant raise the contention in the trial court to preserve the issue for appeal. (*See, e.g. In re S.C.* (2006) 138 Cal.App.4th 396, 406 (*S.C.*).) We find that Mother satisfied this burden.

Appellate counsel also is not prohibited from citing additional authority on appeal in support of arguments first raised before the trial court. And while secondary sources are not binding authority, they may be persuasive in the absence of precedent. (*Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 400.) Here, the law review articles and materials from the California Human Services Agency provided by Mother speak to the trauma of removal. The Legislature has implicitly acknowledged as much in expressing its intent "to preserve and strengthen a child's family ties whenever possible, removing the child from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of

20

the public." (§ 16000, subd. (a); *see also* § 361.3, subd. (a) [giving preferential placement consideration to relatives].)

Because of these legislative goals, the court is always tasked with weighing the risk of returning the children to the home against the harm of removing them. (*See, e.g.*, § 361.2 [explaining safety, protection, and physical and emotional health concerns the court must consider in placing a child]; *In re Jamie M.* (1982) 134 Cal.App.3d 530, 542 [the court must "weigh the evidence of the harm which will be caused the children if they remain in parental custody against the harm caused by placing the children in foster care"].) In this case, the trauma of living at home caused two children to suffer near-fatal anemia; N.W. to have ongoing nightmares of her parents arguing; all three children to live with pain, rotting teeth, and constant itching; and the two older girls to miss months of school. The parents contend several of these problems will not recur because they rid the home of lice, but the court could reasonably have inferred otherwise for the reasons discussed above.[8] On appeal, we "must indulge reasonable inferences that the trier of fact might have drawn from the evidence" and "accept the fact finder's resolution of conflicting evidence." (*O.B., supra,* 9 Cal.5th at p. 1008.) Within this framework, we find no basis to reverse the trial court for balancing the harm of removing the children against the risk of returning them to the home. Moreover, it is undisputed that the Agency and the court

---

[8] Furthermore, the parents attribute N.W.'s acute stress reaction disorder and B.W.'s adjustment disorder to foster care placement, but because these diagnoses were made within weeks of removal, it is not clear whether they were triggered by removal or the conditions in the home. Contrary to the parents' assertion, N.W.'s soiling issues pre-dated removal. Thus, the record supports an inference that any trauma caused by foster placement was less than the trauma experienced by the children in the home.

21

continued to actively pursue placement with the paternal grandmother in order to comply with the statutory preference for familial placement.

   b.   *Reasonable efforts*

The parents further submit that the court erred in finding that the Agency made reasonable efforts to prevent removal.  We again disagree.

A dependent child may only be removed from the parents' custody if the juvenile court finds clear and convincing evidence that "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)  "To aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home, the California Rules of Court require [the Agency] to submit a social study which 'must include' among other things: 'A discussion of the reasonable efforts made to prevent or eliminate removal[.]' "  (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*) quoting Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)  Where applicable, this discussion should include "the option of removing an offending parent . . . from the home."  (§ 361, subd. (c)(1).)

Mother cites to the detention report, which focuses on services provided to the family roughly two and a half years prior, to suggest that the Agency made insufficient efforts to offer services in the recent past.  If we adopt a broader perspective, however, the record paints a different picture.  Indeed, the school district offered to pay for lice treatments in September 2021, but

Mother refused to accept them.[9]  In November of 2021, the school dropped off lice treatments.  The next month, the Agency offered—and Father accepted—additional lice treatments.  On January 18, 2022, a social worker provided Mother information regarding how to treat lice and referrals for free dental appointments and counseling in East County.   And even as her children were being removed, it appears Mother declined a social worker's offer to provide Mother with supplies for cleaning and treating lice.  The Agency also attempted to devise a safety plan for the family and only placed the children at Polinsky because the parents had no one in San Diego County with whom the children could stay.  Thus, the record demonstrates that the Agency made recent and continuing efforts to provide services.

Additionally, because past efforts to aid the family resulted in the parents cleaning up the home and ridding the family of lice for a short time, only to have the problems reoccur, the Agency's focus in the social study was on addressing the underlying reasons why the parents were unable to maintain a clean and lice-free home.  To this end, the Agency referred the parents for parenting classes and psychological evaluations.

Ultimately, this was not a case where "[n]o discussion of reasonable efforts appears in the record."  (*Ashly F., supra,* 225 Cal.App.4th at p. 809.)

---

[9]     Of course, the Agency is responsible for providing services, but the parents' responses to offers of assistance from the school district services are informative in that they demonstrate just a few of many documented instances of outside entities providing lice treatment and instruction to this family to no avail.  In her review of B.W.'s pediatric records, the Rady physician noted that the family was prescribed lice medication during B.W.'s three-year-old well check.  In 2019, Mother again received a prescription for lice medication.  A 2020 visit also reports ongoing problems with treating lice. It was reasonable to conclude that these parents were unable to maintain a lice-free home for reasons other than a lack of access to lice remediation services.

The law requires the Agency's efforts to be "reasonable," not perfect, and the Agency did offer lice supplies, dental services, psychological evaluations, counseling, drug testing, and parenting classes. After four years, the Agency could reasonably conclude that simply providing more lice and cleaning services would be futile (though they nonetheless continued to offer them). Additionally, although the record does not reflect whether the Agency considered removing Father from the home after he tested positive for methamphetamine, the evidence demonstrates that Mother was the primary caregiver leading up to removal and, thus, leaving the children alone with her was hardly a viable option.

In sum, when viewing the record as a whole in the light most favorable to the Agency, we conclude a reasonable trier of fact could have found it highly probable that returning the children to Mother and Father would pose a substantial risk of harm to them, and that there were no reasonable means to protect the minors short of removing them from the parent's physical custody.[10]

B. *Orders on Reunification Services*

The parents contend the juvenile court abused its discretion in requiring them to submit to a 52-week child physical abuse parenting group and supervised visitation. Mother also argues the court erred in ordering her to drug test.

---

[10] There is much to commend about the progress these parents have made over a relatively short period of time. They went from being homeless to having a consistent home and car. Father is not only gainfully employed, but in a management position. They generally appear to have a loving relationship with their children, and social workers at Polinsky have repeatedly noted how caring and thoughtful the girls are when interacting with each other. Although we affirm the trial court's removal order, there is reason for hope that this family will overcome the obstacles to reunification.

1. *The standard of review*

" 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.' " (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186 (*Natalie A.*).) But the court's authority to fashion reunification orders is not "unfettered," (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229 (*Nolan W.*)), as these orders must be "designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300" (§ 362, subd. (d)). Further, the court-approved " 'reunification plan " 'must be appropriate for each family and be based on the unique facts relating to that family.' "[Citation.]' " (*Nolan W.* at p. 1229.) "We review the propriety of court-ordered reunification services at this stage for abuse of discretion." (*In re D.C.* (2015) 243 Cal.App.4th 41, 56.)

2. *The juvenile court abused its discretion in ordering child physical abuse classes for Mother and Father*

Mother and Father object to the juvenile court's order that they complete a 52-week child physical abuse parenting group class. The parents claim the class is inappropriate because the petition and the record reflect neglect, not physical abuse. We agree that the physical abuse class is not justified on this record.

Reunification services are intended to be a "benefit" to the parents (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 475) to help them to eliminate the conditions underlying the section 300 petition (§ 362, subd. (c)). As the parents correctly assert, the juvenile court did not sustain the petition pursuant to section 300, subdivision (a), which relates to physical abuse. Rather, pursuant to subdivision (b), the court found true allegations of neglect. And while "[t]he problem that the juvenile court seeks to address need not be described in the sustained section 300 petition," (*In re Briana*

25

*V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*)), there must be some relationship between the reunification services and the conditions the court seeks to rectify (*See* § 362, subd. (d) [the program "shall be designed to eliminate those conditions"].).

The evidence of intentional physical abuse in this case is negligible, at best, and none of it pertains to Father. In 2017, a neighbor observed Mother spanking a child and neighbors heard what sounded like slapping sounds. Mother admitted to spanking the children in the past[11] and later tapping them on the mouth when they started screaming (but not hard enough to leave a mark). She has since ceased both forms of punishment. Arguably, drugging the girls with Nyquil every night for three to four months falls within the realm of physical abuse, though this alone does not support a reasonable inference that the children were at risk of physical abuse because it appeared intended as an imperfect method of helping the children cope with the lice. As N.W. explained, after their mother gave them "medicine to go to sleep . . . [w]e lay down and then sleep, the bugs don't bother us."

The record is also devoid of even minimal detail about the content of the physical abuse class. In every child welfare case, the Legislature requires the Agency to prepare a case plan which ensures, among other things, "that services are provided to the child and parents or other caretakers, as appropriate, in order to improve conditions in the parent's home, to facilitate the safe return of the child to a safe home." (§ 16501.1, subd. (a)(1)-(2)[12].)

---

11 Section 300, subd. (a) states that " 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."

12 The code section in effect at the time the juvenile court issued its dispositional order has since been amended, but the language of this subsection did not change.

"The case plan shall be included in the court report, and shall be considered by the court at the initial hearing and each review hearing." (§ 16501.1, subd. (g)(14).) Further, the court must consider whether the case plan meets the requirements of section 16501.1. (Cal. Rules of Court, rule 5.690, subd. (c)(2)(A); *In re M.R.* (2020) 48 Cal.App.5th 412, 424 (*M.R.*)). If it does not, "the court must order the agency to comply with the requirements of section 16501.1." (Cal. Rules of Court, rule 5.690, subd. (c)(2)(B).) And again, because the court can cannot arbitrarily order parents to participate in counseling and education programs that are "not reasonably designed" to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child, "the case plan must identify specific goals and then explain how the 'planned services' are designed to achieve those goals." (*M.R.,* at p. 424.)

In this case, the Agency identified the goal for the parents, but not how the 52-week child physical abuse parenting group would achieve that goal. Specifically, the Agency explained in the initial case plan that the objective of the group was to: "gain and increase . . . knowledge of the health, safety and emotional needs of [their] children. . . .Through this service, the [parents] will be able to demonstrate an understanding of [their] role[s] that led to the child[ren]'s removal from [their] care. The [parents] will be able to demonstrate the steps [they] will take going forward to ensure [the] child[ren]'s safety and well-being." However, read within the context of a physical abuse class, this suggests that the parents will gain an understanding of why their *physical* abuse led to removal and what steps they must take in the future to protect their children from themselves. The parents, understandably, take issue with this explanation. The subject of the

27

class also implies that the parents intentionally, as opposed to negligently, inflicted harm on their children.

The Agency provided no details about class content. Without any further information before us about what the class entails, we conclude the class does not appear appropriately targeted to resolving the neglect issues facing this particular family. (*Nolan W., supra,* 45 Cal.4th at p. 1229 [requiring that reunification services "be based on the unique facts relating to that family"].) The Agency's task is to recommend services that are "appropriate" to "improve conditions in the parent's home" and facilitate the children's safe return. (§ 16501.1 subd. (a)(2).) Because the case plan requiring the physical abuse class does not meet the requirements of section 16501.1 (Cal. Rules of Court, rule 5.690, subd. (c)(2)(B)), we conclude that the court abused its discretion in approving the case plan.

It may be that the child physical abuse class the Agency recommended generally encompasses issues that arise in severe neglect cases, such that it would benefit these parents in recognizing how their actions harmed their children and what steps they must take in the future to safeguard their children's health, safety, and emotional needs. The argument by Agency counsel during the contested disposition hearing seems to suggest that it does.[13] But argument of counsel is not evidence (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11), and nothing else in the record before us explains

_____

[13]    During the contested disposition hearing, Agency counsel explained that "[i]t is protocol for the Agency, under the child abuse treatment standards, to refer to child abuse group therapy in cases of severe neglect resulting in injury to a child." Counsel further explained that "the subject matter of a child abuse group broaches all manners of abuse. It includes content related to emotional and cognitive affects (*sic*) of abuse on children, anger and stress management, developmental issues, effective parenting, family dynamics, substance abuse prevention and relapse prevention."

what topics the class covers or how it educates neglectful—as opposed to intentionally abusive—parents. Accordingly, on this record, it was not reasonable for the juvenile court to infer that a child physical abuse class would redress these parents' neglect issues.[14] (*In re. Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) We reverse and leave it to the trial court's sound discretion on remand to make a record supporting this reunification class or consider alternative options.[15]

3. *The juvenile court did not abuse its discretion in ordering drug testing upon reasonable suspicion for Mother*

Mother contends the juvenile court abused its discretion in ordering her to submit to on-demand drug testing based on reasonable suspicion because the record contains no evidence that a drug testing order was necessary to eventually return the children to her care. We disagree.

At the disposition hearing, Mother requested that the juvenile court strike the drug testing requirement from her case plan, arguing that drug use by Father "is not the basis alone for reasonable suspicion that mom is using." She further points out on appeal that *she* has produced no positive test results, has no drug-related criminal history, and has never been witnessed

---

[14] We also conclude that the error was not harmless because the court actually authorized a service "for which the case plan has not identified a connection to plan goals." (*M.R., supra,* 48 Cal.App.5th at p. 429 [acknowledging that harmless error analysis generally applies in juvenile dependency proceedings and concluding that a case plan error only causes concrete harm if the service lacking connection to a goal is actually recommended].)

[15] Because we reverse on other grounds, we do not address Mother's arguments that the Agency did not consider her opinion regarding the case plan and that a physical abuse class would be traumatic for her because of her own childhood abuse.

caring for the children while under the influence.  Mother cites to *In re Sergio C.* (1999) 70 Cal.App.4th 957 (*Sergio C.*) and *In re Basilio T.* (1992) 4 Cal.App.4th 155 (*Basilio T.*) in arguing that drug testing is not an appropriate reunification plan requirement where there is no evidence of drug use by the parent.  Unfortunately, that is not the case here.

In *Sergio C.*, the court reversed a drug testing order because the only evidence that the father used drugs was the "unsworn and uncorroborated allegation of an admitted drug addict [the mother] who ha[d] abandoned her children." (*Sergio C., supra,* 70 Cal.App.4th at p. 960.)  Here, Mother has admitted smoking marijuana and consuming liquor.  Although she claims to have stopped using both, the family's trailer contained multiple liquor bottles.  Father also stated that he keeps marijuana, pipes, and a bong in the closet, so there is evidence the drug is available in the home.  Moreover, in *Sergio C.* the father did not live with the drug-using mother.  (*Ibid.*)  In this case, Mother and Father live together, and Father conceded using marijuana and recently tested positive for methamphetamines.  Given this ready access to various substances and her admitted prior history, the court could reasonably have inferred that some level of substance abuse may have contributed to Mother's inability to care for her children.

*Basilio T.* is equally unpersuasive.  In that case, the only evidence that either parent had a substance abuse problem was the mother's unusual behavior and obsession with discussing an invention that would make them a fortune.  (*Basilio T.,* 4 Cal.App.4th at p. 172.)  But her counsel offered proof that the couple had, in fact, patented a product and were attempting to market it.  (*Id.* at pp. 164, 172.)  Because this left only the mother's behavior as justification for the order, which the court concluded was insufficient to

show she had a substance abuse problem, the court reversed. (*Id.* at pp. 172–173.)

More than just unusual behavior is present here. As the Agency acknowledges, Mother clearly loves her children, and it is reasonable to assume she would not neglect them to the point where two of them nearly died if she were not significantly impaired. Mother has admitted to having untreated PTSD, depression, anxiety, and panic disorder. The court could reasonably infer that she may have been self-medicating with drugs and alcohol. At the very least, it was prudent under the circumstances to rule out substance abuse in conjunction with mental illness as contributing to the conditions underlying the petition.

As discussed previously, these children have lived for four years, almost continuously, with lice and roach infestations, and their health and education have suffered as a result. It was within the juvenile court's broad discretion to conclude that an order targeted at deducing the underlying cause of this neglect was in their best interest. (*See Natalie A., supra,* 243 Cal.App.4th at p. 186 [the juvenile court has broad discretion to determine how best to protect the child's interests]; *see also In re Caden C.* (2021) 11 Cal.5th 614, 641 ["abuse of discretion applies when a lower court must delicately balance factual determinations to assess an uncertain future situation" and though minds may differ, if the trial court's inference was reasonable on the facts, " ' " 'the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "]).) We find no abuse of discretion.

4. The *juvenile court did not abuse its discretion in ordering supervised visitation for both parents*

The parents argue that because the children were removed due to the unsanitary condition *in the home* and the resulting lice infestation, there was no compelling reason to deny them unsupervised visitation *outside* the home.

31

We conclude the juvenile court did not abuse its discretion in ordering supervised visitation for an initial period.[16]

"In a dependency proceeding, the juvenile court has the power and responsibility to define a noncustodial parent's right to visit with his or her child after the minor has been adjudged a dependent child of the court and has been removed from parental custody." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373 (*Moriah T.*).) To maintain ties between parents and children, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd (a)(1)(A).) The juvenile court is vested with broad discretion to determine the best interests of dependent children. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652.)

Both parents stress that the home environment provided the basis for jurisdiction. But as previously discussed, the court is not limited to the confines of the section 300 petition in fashioning reunification measures. (*See Briana V., supra,* 236 Cal.App.4th at p. 311 ["the court may consider the evidence as a whole" when determining "what dispositional orders would be in the best interests of the children"].) The evidence of neglect before the trial court also demonstrated that the parents repeatedly failed to supervise their children. "No visitation order shall jeopardize the safety of the child" (§ 362.1, subd (a)(1)(B)) and, given the parents' recent and repeated failures to keep track of B.W. in areas presenting very real hazards like traffic and a

---

16    The Agency argues we should disregard Father's argument because he did not support it with legal authority or citation to the record. While it is true an appellant must demonstrate error by presenting meaningful legal analysis supported by citation to facts in the record and legal authority (*S.C., supra,* 138 Cal.App.4th at p. 408), this argument came late in the brief after Father had already discussed the same facts. Regardless, Mother properly argued the issue on appeal. And, as we find no abuse of discretion, the point is moot.

pool, the court could reasonably have concluded the circumstances warranted supervised visitation.

Furthermore, an initial order of supervised visitation is routine and appropriate in cases where concerns for the children rose to the level of requiring removal. Here, the level of neglect required hospitalization of two of the girls following removal and there were concerns about the girls being hungry. Both the Agency and court had reason to be concerned that mental illness or drug use may have contributed to the neglect. All of these issues raised red flags regarding leaving the girls unsupervised with the parents. Given the totality of these circumstances, the court acted within its discretion to protect the safety of the children. (§ 362.1, subd (a)(1)(B).)

Of course, pursuant to the Agency's "statutory mandate to supervise each case in a manner consistent with the child[ren]'s best interests" and adapt to changing circumstances within this family (*Moriah T., supra,* 23 Cal.App.4th at p. 1376), the Agency may decide, if it has not done so already, to allow unsupervised visits. The juvenile court granted the Agency discretion to allow unsupervised visits with 48 hours' notice to the minors' counsel. There is nothing improper about a court delegating discretion to the Agency regarding "the time, place and manner of the visits" (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009), and we assume the Agency will exercise this discretion with the goal of normalizing contact between parents and children as soon as possible.

## DISPOSITION

The portion of the April 5, 2022 disposition orders requiring the parents to participate in a 52-week child physical abuse parenting group is reversed and the matter is remanded for reconsideration of that issue. The disposition orders are otherwise affirmed.

33

DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.